745 So.2d 743 (1999)
Burnetta KELLY
v.
WEST CASH & CARRY BUILDING MATERIALS STORE, et al.
No. 99-CA-0102.
Court of Appeal of Louisiana, Fourth Circuit.
October 20, 1999.
*747 Ford & Harrison, John L. Monroe, Jr., John L. Telford, Jr., Atlanta, Georgia, and Burke & Mayer, William B. Hildalgo, New Orleans, Louisiana, Counsel for Defendants-Appellees.
Ray A. Bright, New Orleans, Louisiana, Counsel for Plaintiff-Appellant.
Court composed of Judge WILLIAM H. BYRNES III, Judge MIRIAM G. WALTZER, Judge MOON LANDRIEU, Judge PATRICIA RIVET MURRAY and Judge DENNIS R. BAGNERIS, Sr.
BYRNES, Judge.
The plaintiff, Burnetta Kelly was arrested and fired from her job as assistant head cashier at West Cash & Carry Building Materials Store (West), a retail outlet, based on allegations that she assisted an unidentified man to remove merchandise from the store without payment. The charges were ultimately dropped and similar allegations were rejected by the State of Louisiana Office of Employment Security. Plaintiff filed a petition alleging false arrest and imprisonment, defamation, wrongful discharge, malicious prosecution and infliction of emotional distress. Named as defendants were plaintiff's employer, West, Jill Fourcade, Edward Knight, the store manager, Marshia Jimenez[1], Michael LaBauve[2], Gary Heflin[3], Keith Yeager and the XYZ Insurance Company.
Pursuant to a motion for summary judgment, the plaintiff's claims were dismissed *748 in their entirety. We affirm in part, and reverse and remand in part.
On appeal, the plaintiffs brief explicitly asserts error in the misapplying by the trial court of the "standard of qualified privilege regarding the defamatory communications made by the defendants," and in the trial court's failure to find that plaintiff had succeeded in raising genuine issues of material fact in connection with her claims of false imprisonment and intentional and/or negligent infliction of emotional distress. Implicit in plaintiffs petition and brief is the assertion of error in the trial court's failure to find in favor of the plaintiff on the issue of malicious prosecution. Plaintiffs appeal does not raise the issue of wrongful discharge. Therefore, we will treat the issue of wrongful discharge as having been abandoned. Uniform Rules  Courts of Appeal, Rule 2-12.4.
West hired plaintiff as a cashier in October of 1995. Samantha Boudreaux, plaintiffs immediate supervisor at the time she was later arrested, told her that West was hiring. Shortly before she was terminated, Mr. Edward Knight, the store general manager, promoted her to the position of assistant head cashier. Early on July 2, 1996, Mr. Knight held an employee meeting at which he informed the employees that merchandise was missing and that it was suspected that an employee might have allowed a customer to leave without paying.
After the meeting, cashier Marshia Jimenez informed Mr. Knight that she witnessed a suspicious incident on June 30, 1996, when an unknown man was allowed to leave the store without a receipt because plaintiff vouched for him. Another cashier, Jill Fourcade, confirmed this to Gary Heflin, the Consumer Marketing Director.
Ms. Kelly was summoned to Mr. Knight's office later the same morning.

I. FALSE IMPRISONMENT
Plaintiff alleges that when she was summoned to Mr. Knight's office for questioning she was wrongfully detained against her will. Plaintiffs brief contends that she "was held against her will in the office ... for approximately three hours" where she was interrogated until the police came and arrested her.
The affidavit of Burnetta Kelly made the following assertions bearing on this issue:
17.
Then I was told that Mr. Knight ordered me to report to his office. Immediately, I reported to Mr. Knight's office about 10 a.m.
18.
When I reported to his office on the morning of July 2, 1996, about 10 a.m., Mr. Knight, Gary Heflin and Keith Yeager accused me of stealing a lawn mower and other merchandise from the store by helping a man on June 30, 1996.
19.
I told Mr. Knight, Gary Heflin and Keith Yeager that I did not steal any merchandise from the store on June 30, 1996 or any other time. I told Mr. Knight, Gary Heflin and Keith Yeager that I did not help anyone steal any merchandise from the store on June 30, 1996 or any other time. I told them that I did not tell Marshia Jimenez, Jill Fourcade or any other employee to allow anyone to take any merchandise out of the store on June 30, 1996 or any other time. Mr. Knight and Gary Heflin told me to confess and they would not call the police. I told them I was not confessing to anything I did not do.
20.
I was kept in Mr. Knight's office from 10 a.m. to about 1 p.m. At one point during the questioning I stood and walked near the closed door. But, Mr. Knight ordered me to sit down in the *749 chair. I sat down and they continued to question me.
21.
When my husband arrived and came in the office, he told me that I did not have to stay there and take this. But, Mr. Knight told him that I could not leave. Mr. Knight and Gary Heflin ordered my husband to leave. My husband left the office without me.
22.
Through all of this, I was scared and felt sick to my stomach. I felt myself trembling and could not sit still. I could not understand what was happening to me. My father came in the office trying to find out what had happened. But, the police came in and arrested me.
The affidavit of Terrence L. Kelly, the plaintiffs husband, relates the same incident from his perspective:
4.
I entered the store office where Store manager, Edward Knight, and Assistant Manager Gary Heflin were holding my wife.
5.
Manager Knight and Assistant Manager Heflin ordered me to leave the room. I asked them what gave them the right to hold Burnetta. Manager Knight and Asst. Manager Heflin accused her of stealing and again ordered me to leave the room.
6.
I told Burnetta that she did not have to stay there. I said to her, get-up and lets go. Manager Knight told her the store had a right to hold her because of the theft of merchandize [sic] by her. Manager Knight told her to admit to stealing and he would allow her to leave. [Emphasis added.]
7.
Manager Gary Heflin again told me to leave. So, I left the room. Burnetta's father, Leroy Jackson, arrived on the scene and went to the office. But, Burnetta did not come out with him either. I waited for about another 1 hour before the police arrested her.
8.
During the time the store management held Burnetta in the office, Burnetta appeared frightened, her eyes were watery, she looked visibly shaken and physically ill. Burnetta looked sad like she was physically drained. Burnetta did not look like she could handle being accused of a crime and held in the room.
In her deposition, Burnetta Kelly also testified that she was interrogated in the company office. She testified that at one point in the questioning, she was left alone in the unlocked room, during which time she called her husband and mother who were not at home, but she did not attempt to leave. Next she called her mother-in-law and her brother, followed by a return call from her father. A few minutes later Mr. Knight and Mr. Heflin came back into the room. Shortly thereafter, her husband came to the room and asked what was going on. Ms. Kelly testified that Mr. Heflin asked her husband to leave. Significantly, Ms. Kelly testified that she never asked to leave the room and that the door to the room was never locked. Ms. Kelly did not state in her deposition as she did in her later affidavit that at one time she got up and was ordered to sit back down. Her deposition testimony failed to confirm her husband's affidavit statement that she was told the store had a right to hold her.
Ms. Kelly's testimony and affidavit and her husband's affidavit are significant for what they fail to say. There is no testimony or affidavit suggesting that there was any physical impediment preventing her departure, or any threat of physical force preventing Ms. Kelly's freedom of movement. In fact, Mr. Kelly's affidavit states that he told his wife that she could leave. *750 Ms. Kelly's affidavit and testimony do not say that she felt that there was any physical impediment or threat of physical force preventing her from leaving. The plaintiff admitted that the door was not locked, and offered no evidence of actual or threatened physical restraint.
False imprisonment is the unlawful and total restraint of the liberty of the person. Crossett v. Campbell, 122 La. 659, 48 So. 141 (1908).[4] Submission to the mere verbal direction of an employer, unaccompanied by force or by threats, does not constitute false imprisonment. Moen v. Las Vegas Intern. Hotel, Inc., 90 Nev. 176, 521 P.2d 370 (1974); Mullins v. Rinks, Inc., 27 Ohio App.2d 45, 272 N.E.2d 152 (1971); White v. Levy Brothers, Inc., 306 S.W.2d 829 (Ky.1957). And there is no false imprisonment where an employer declines to terminate an interview of his employee if no force or threat of force is used. Id. False imprisonment may not be predicated on a person's unfounded belief that he was restrained. Id. Apprehension that one might in the future lose one's job or be prosecuted for theft is not the force or the threat of force necessary to establish false imprisonment. Moen, supra. Bare words are insufficient to effect an imprisonment if the person to whom they are spoken is not deprived of freedom of action. Ford Motor Credit Co. v. Gibson, 566 S.W.2d 154 (Ky.1977); Grayson Variety Store, Inc. v. Shaffer, 402 S.W.2d 424 (Ky.1966).
In Dominguez v. Globe Discount City, Inc., 470 S.W.2d 919 (Tex.Civ.App.1971), the plaintiff was ordered about by a security guard, which if anything should carry a greater inference of force than would an order from one's employer. But the Dominguez court noted that there was never any physical force and that the plaintiff was never touched by the security guard. The plaintiff did not testify that the guard threatened her or exercised any physical restraint. The court found no false imprisonment.
In Hughes v. Gulf International, 593 So.2d 776 (La.App. 4 Cir.), writ denied 595 So.2d 658 (La.1992), a security guard and a theater manager attempted to prevent a rowdy theater patron from re-entering the screening room of the theater. In the process of doing so, the manager "delivered a karate chop" to the plaintiff's neck, and she fell to the floor. Plaintiff was arrested by the police when they arrived. This Court reversed the jury's finding that the plaintiff's arrest and imprisonment had been caused by the defendants, in spite of the evidence of the threat of and use of physical force which find no counterpart in the instant case. The only arrest and imprisonment which this Court found in Hughes was plaintiff's arrest by the police. This Court went on to state that:
In the instant case, Ms. Hughes was detained only when she was arrested by the police. The record indicates that this detention was lawful. The entirety of the arresting officer's testimony established that he investigated this incident, spoke to all parties involved and concluded there was probable cause to arrest Ms. Hughes. Ms. Hughes caused a disturbance in the presence of the police officers by cursing and refusing to cooperate. Although the police were called to the theater on the complaint of defendants, the decision to arrest was made by the arresting officer and not by the theater employees. [Emphasis added.] Therefore, we disagree with the jury's finding that defendants unreasonably caused Ms. Hughes to be wrongly arrested and imprisoned. Accordingly, that portion of the trial court's judgment finding defendants liable for false arrest and imprisonment is reversed and set aside.
Id., at p. 780.
Thus, in Hughes, as in the instant case the decision to arrest was made by the arresting officer, not the defendants.
*751 In Harrison v. Phillips, 539 So.2d 911 (La.App. 4 Cir.), writ denied 541 So.2d 894 (La.1989), this Court, in finding that plaintiff's liberty was not restrained by his employer, noted that there was insufficient evidence to established that the plaintiff was locked in by the employer. In the instant Ms. Kelly does not contend that she was locked in.
We also find that the decision of the arresting officer to arrest the plaintiff in Harrison was based on information very much analogous to that utilized by the arresting officer in the instant case.
Clark v. I.H. Rubenstein, Inc., 326 So.2d 497 (La.1976) does not involve an employee. It is in the nature of the employer-employee relationship that the employer may give orders to the employee restricting his liberty of movement. Such does not constitute a "restraint of liberty" in the sense of false imprisonment.
In Weiler v. Herzfeld-Phillipson Co., 189 Wis. 554, 208 N.W. 599 (Wis.1926), a case remarkably similar to the instant case the court noted that:
In the instant case an employer summoned to his office an employe[e] for an interview concerning matters coming to the attention of the employer casting doubt upon the fidelity of the employe[e]. The office was small, but it was a regularly established office of the employer. The interview was somewhat prolonged, but during the entire period the time of the employe[e] belonged to the employer. She was compensated for every minute of the time spent by her in the office. Her time was under the employer's direction and control. The subject of the interview was the conduct of the plaintiff in the discharge of her duties as an employe[e]. The only evidence of restraint imposed upon the plaintiff was her own testimony that upon two occasions during the interview she asked [her employer] if she could leave the room, and he replied, "Why no, what do you want to go out for;" that she got up, and he said, "Sit down."
Upon one occasion she asked if she could telephone to her husband, and he said "No;" that her husband had nothing to do with the matter.
.... [The door] was not locked from the inside, and the door could readily be opened by turning a knob. While the interview was somewhat long, we know of no standard by which the length of such interviews within the bounds of propriety may be definitely fixed.
* * * *
There is the further evidence that he threatened to call the patrol and send her to jail if she did not confess. We cannot express our entire approval of this conduct on the part of Mr. Carter. It savors too much of third degree methods. It was one of the means adopted by Carter to coerce a confession from the plaintiff. It amounted to intimidation, and tended to deprive the plaintiff of her own free will. That, however, bears only upon the value of her confession as evidence. It has nothing to do with the question of whether she was falsely imprisoned. The so-called confession might have been made because she feared that, otherwise, she would be sent to jail. That fact might render her confession involuntary, but it would not make her presence in the room false imprisonment.
Plaintiff in the instant case was allowed more freedom under interrogation by her employer than was the Weiler plaintiff. The West executives allowed Mrs. Kelly to make a number of phone calls and receive visits from family members.
Mr. Knight testified that the plaintiff was always free to leave. In the trial court, plaintiff's opposition to the summary judgment motion focused on allegations that plaintiff was detained in Knight's office for three hours in contravention of LSA-C.Cr.P. art. 215 which limits the authority of a merchant to detain someone for questioning for the suspected "theft of *752 goods," "for a length of time, not to exceed sixty minutes." The defendants counter that the plaintiff was questioned in Knight's office for less than sixty minutes. However, this fact, although contested, is not material, because we have found that management's questioning of plaintiff did not constitute an imprisonment. It does not matter if an employee is ordered by her employer to subject herself to interrogation for more than the sixty minutes allowed in LSA-C.Cr.P. art. 215 when the only impediment to her freedom of movement is the psychological force of her employer's orders unaccompanied by any actual or physical restraint.
At a trial on the merits, the burden would be on the plaintiff to prove that she was falsely arrested or imprisoned. An essential element of such a tort is proof of total restraint. The defendants offered sufficient evidence of a lack of total restraint to shift the summary judgment burden to the plaintiff and prevent plaintiff from resting on mere allegations. LSA-C.C.P. art. 966C(2). Plaintiff offered no evidence of any actual or threatened total or partial physical restraint  and for the restraint to constitute an imprisonment it must be total. Crossett v. Campbell, supra. Accordingly, we find no basis for reversing the trial court judgment as regards plaintiff's claim for false arrest or imprisonment.

II. DEFAMATION
Plaintiff in her brief complains that publication of defamatory allegations was made to law enforcement authorities, the Office of Employment security, John Jacobs, Bill Berger, Harlon Seats and R.E. Harrington Company.
The elements of defamation are: (1) Defamatory words; (2) Publication; (3) Falsity; (4) Malice, actual or implied; and (5) Resulting injury. Melancon v. Hyatt Corp., 589 So.2d 1186, 1189 (La.App. 4 Cir.1991), writ denied, 592 So.2d 411 (La. 1992). Words that impute to an individual the commission of a crime are defamatory per se; malice and falsity are presumed and the burden shifts to the defendant to rebut the presumption. Id. Publication is communication of the defamatory statement to someone other than the party defamed. Id.
Plaintiff's petition does not allege defamation, libel or slander or publication. Both parties seem to believe, however, that the issue has been raised. One may infer limited publication from the facts set forth in the petition, and publication is apparent from the evidence. If we were to find that the petition does not state a cause of action in defamation, plaintiff could easily amend based on evidence already apparent from the face of the record. Therefore, we will proceed with a consideration of this issue.
An otherwise defamatory publication enjoys a qualified conditional privilege if made (a) in good faith; (b) on any subject matter in which the person communicating has an interest or in reference to which he has a duty; and, (c) to a person having a corresponding interest or duty. Clements v. Ryan, 382 So.2d 279, 282 (La.App. 4 Cir.1980). A statement is made in good faith when it is made with reasonable grounds for believing it to be true. Id.; Harrison v. Uniroyal, Inc., 366 So.2d 983, 986 (La.App. 1 Cir.1978). The jurisprudence establishes that communications between appropriate persons within the employer's walls, concerning allegations of conduct by an employee that bears on the employer's interest, are subject to the qualified privilege if made in good faith. Martin v. Lincoln General Hosp., 588 So.2d 1329 (La.App. 2 Cir.1991), writ denied 592 So.2d 1302 (La.1992).
The relevant reporting line on the store's organizational chart for Assistant Head Cashier Burnetta Kelly leads to the Head Cashier (Samantha Boudreaux), and thence to the assistant Consumer Marketing Manager (Keith Yeager), the Consumer Marketing Manager (Gary Heflin), the *753 assistant manager (John Jacobs) and the manager (Edward Knight). We find that all of these individuals have an interest in the matter and a concomitant qualified privilege to discuss the matter among themselves.
Later the company dropped the charges. According to Mr. Knight this was done at the suggestion of the District Attorney's office. When Ms. Kelly sought unemployment benefits, the company unsuccessfully opposed her.[5] Plaintiff contends that the failure to prosecute the charges successfully through either the criminal court system or through the unemployment compensation hearing system is proof that the charges were unfounded, i.e., that they were not made in good faith. Consequently plaintiff contends that the defendants are not entitled to the qualified privilege defense to defamation.
In Cangelosi v. Schwegmann Bros. Giant Super Markets, 390 So.2d 196 (La. 1980), plaintiff who was a cashier was called in to the store's vault room in the presence of the store manager, check cashing supervisor, vault room supervisor and plaintiff's supervisor and assistant supervisor for questioning in connection with an altered check incident. The Supreme Court found that all those present were appropriate to the investigation.
In Melancon, supra, at p. 1188, this Court noted that:
Mr. Melancon testified that when he went to clean out his locker, his fellow employees didn't speak to him, and he felt that they all knew the reason he was discharged. Larry Washington, a former employee in the Maintenance Department of the Hyatt, testified at trial that he was told by Betty Mullens, a cafeteria employee, that Mack Melancon was fired for stealing towels. Richard Johnson, another former Hyatt employee, stated that he was told the same thing by fellow employees Vic Sperling, West Young, Victor Artist, and "a lot of guys" sitting at the table during a break time at the Hyatt.
However, this Court expressly rejected the suggestion that the qualified privilege extends to any and all employees. This Court also expressly refused to follow Rouly v. Enserch Corporation, 835 F.2d 1127 (5 Cir.1988) to the extent that opinion might lead to a contrary conclusion.
Implicit in this Court's finding in Melancon is the conclusion that the company involved published the defamatory information indiscriminately among employees, such as cafeteria workers, who had not even the remotest claim to a qualified privilege. In effect, this Court found that there was defamatory publication to employees *754 who had no interest in the matter, one of the elements essential to a claim of qualified privilege.
As there are a number of defendants and a number of accusations about who said what to whom, in order to determine whether any genuine issue of material fact exists as to any defendant regarding plaintiff's defamation allegations, it is necessary that we undertake the laborious process of determining what the record indicates may have been communicated by each of the various defendants, and to whom they may have made each communication.

A. Defendant Edward Knight
Mr. Knight testified in his deposition and attested in his affidavit that after the employee meeting of July 2, 1996, Ms. Jimenez informed him that on June 30, 1996 an unidentified man was allowed to leave the store without a receipt after being vouched for by plaintiff. Mr. Knight also testified in his deposition that in addition to the report of suspicious activity by Ms. Jimenez and confirmed by Ms. Fourcade, merchandise was missing from the store and he had received anonymous phone calls telling him that someone had been overheard bragging that he was stealing merchandise from the store with inside assistance. Mr. Knight also testified that he, Mr. Gary Heflin and Mr. Keith Yeager went through the records of plaintiff's sales for June 30 and found no record for sales of the type of merchandise allegedly authorized by Ms. Burnetta Kelly to be taken out of the store without a receipt. When interrogated Ms. Kelly denied the allegations.
When cross examined by the plaintiffs counsel as to why the police were summoned, Mr. Knight replied: "I had two individuals that had no motive that I could see telling me a story that was different from what Burnetta was telling me. I had merchandise that we could tell was missing. We had anonymous tips telling us that a person was involved with someone else in my store, and to me that was enough information for me to ask the police to come in and investigate it."
Mr. Knight testified that he discussed the incident with Gary Heflin, John Jacobs, Keith Yeager and Samantha Boudreaux, each of whom is in the reporting chain, and with West's attorney, all of whom are employed by West locally. He also discussed the matter with Michael Robinson, who is in charge of personnel at the home office. Finally, Mr. Knight said that he communicated with R.E. Harrington Company, the company that represents West in unemployment hearings. These communications are clearly privileged.
Mr. Knight further testified that when the police came they talked to him, to Gary Heflin, and to the plaintiff. The police told him, "we think we have enough evidence here to arrest her." The police asked him to sign the arrest report and then arrested plaintiff.
A citizen is not guilty of malice for inaccurately reporting criminal conduct when there is no intent to mislead. Taylor v. Town of Arcadia, 519 So.2d 303, 307 (La.App. 2 Cir.), writ denied 522 So.2d 1097 (La.1988); O'Conner v. Hammond Police Dept., 439 So.2d 558, 561 (La.App. 1 Cir.1983). The public has an interest in possible criminal activity being brought to the attention of the proper authorities, and remarks made in good faith setting forth well-founded charges are clearly privileged. Jones v. Wesley, 424 So.2d 1109, 1111 (La.App. 1 Cir.1982). There is no evidence tending to show that Knight's communication to the police exceeded the scope of the privilege.
Mr. Knight's affidavit attested to the fact that he received a letter from the Louisiana Department of Labor referencing Burnetta Kelly and requesting the following:
Please respond by 7/18/96 so that a decision can be made on this claim. Why was the claimant discharged from this employment? Give full details of the *755 incident which resulted in the claimant's separation. Send signed witness statements from anyone present when the incident took place. Was the claimant accused of stealing merchandise, or assisting someone in stealing co. merchandise? Were the police notified? If so, were charges pressed against the claimant? What was the outcome? What evidence is there against the claimant? You must prove misconduct in order for a disqualification to be assessed. A decision will be based upon all available information.
Plaintiff argues in her brief that there is a genuine issue as to whether the communications by West and its employees to the state unemployment agency were privileged and in her brief quotes from Farria v. La Bonne Terrebonne of Houma, Inc., 476 So.2d 474, 475 (La.App. 1 Cir.1985):
To hold that confidential communications [sic] between an employer and the Department of Employment Security can never be defamatory would require us to disregard the case law dealing with publication. Such a holding would also negate the need for the defense of qualified privilege which was used in Harrison [v. Uniroyal, Inc., 366 So.2d 983] and in Boyd v. Community Center Credit Corp., 359 So.2d 1048 (La.App. 4th Cir.1978).
However, Farria involved an exception of no cause of action and the court was required to accept as true the plaintiff's allegation that the separation notice filed by the plaintiff's employer alleging theft was filed with malice. Significantly, the next sentence of Farria states that: "The protection afforded an employer by the defense of qualified privilege may be raised in a motion for summary judgment...," just as the defendants did in the instant case.
We find that West had a qualified privilege to respond to this state agency request for information based on Mr. Knight's good faith appreciation of the facts.
In cases affecting the exercise of First Amendment liberties, proper summary judgment practice is essential. Summary adjudication may be thought of as a useful procedural tool and an effective screening device for avoiding the unnecessary harassment of defendants by unmeritorious actions which threaten the free exercise of rights of speech and press. Joyner v. Wear, 27,631 (La. App.2d Cir.12/6/95), 665 So.2d 634, citing Mashburn, v. Collin, 355 So.2d 879 (La. 1977). Thus, in order to survive a motion for summary judgment, a defamation plaintiff must produce evidence of sufficient quality and quantity to demonstrate that he likely will be able to meet his burden of proof at trial. Without such evidence, there is no genuine issue of material fact, and summary judgment should be granted. Sassone v. Elder, [626 So.2d 345 (La.1993)].
Zellinger v. Amalgamated Clothing, 28,127, pp. 3-4 (La.App. 2 Cir. 4/3/96); 683 So.2d 726, 730.
Boyd v. Community Center Credit Corp., 359 So.2d 1048, 1050 (La.App. 4 Cir.1978), cited in Farria, explains the public policy driving the qualified privilege regarding information furnished to the Department of Employment Security:
The interest of public welfare and social necessity dictate that an employer not be unreasonably restricted when he is required to furnish information necessary for the state agency to determine in a quasi-judicial proceeding a terminated employee's eligibility for unemployment compensation benefits. The party furnishing the information must be free to make a complete and unrestricted communication, without fear that he will be held liable for defamation if the good faith communication turns out to be inaccurate, subject to the requirement that the communication be made in good faith, be relevant to the subject matter of the inquiry, and be made to a person with a legitimate interest in *756 the subject matter. [Emphasis added; citations omitted.]
Employers must be permitted to avail themselves of summary judgment procedure if the policy of free communication is to be effectuated. Were employers to fear that they would in all cases face a full trial on the merits in order to avail themselves of the qualified privilege, it would have an effect on communications deemed necessary and desirable by public policy almost as stifling as would be the elimination of the qualified privilege itself. In other words, summary judgment procedure is necessary in order to avoid a chilling effect on communications deemed desirable by public policy.
Plaintiff does not contest the relevancy of the communication to the state unemployment agency. Nor does the plaintiff contest the fact that the person to whom the communication was made in the unemployment agency had a legitimate interest in the subject matter. Plaintiff contests only the good faith component of the communication. The defendants have offered sufficient evidence of good faith to shift the burden back to the plaintiff to prove otherwise, and plaintiff has failed to do so.
Therefore, according to the standard set forth by this Court in Boyd, supra, defendants are protected in their communications to the unemployment office by a qualified privilege.
Mr. Knight acknowledged in his deposition that he testified at the unemployment hearing. When plaintiff's counsel asked Mr. Knight if he released information concerning the incident at the unemployment hearing, Mr. Knight responded: "I was under oath to answer your questions." Mr. Knight also discussed the matter with Mr. Telford, the company attorney.
All of the above-described communications by Mr. Knight are subject to the qualified privilege.
In her brief plaintiff alleges that Mr. Knight also communicated the matter to Mr. Harlon Seats, the company president. Mr. Knight denied having reported the incident to Mr. Seats, but had he done so, it would have been subject to a qualified privilege by virtue of the fact that Mr. Seats was not only company president, he was also one of the two men to whom Mr. Knight reported directly in the chain of command.
In his deposition, Mr. Knight testified that he received a written incident report from a Mr. Eddie Wishen, the Operations manager. Mr. Knight did not say that he ever communicated anything about the incident to Mr. Wishen and the plaintiff makes no reference to Mr. Wishen in any of her pleadings or arguments. Mr. Knight testified that the report from Mr. Wishen concerned efforts made to prevent the plaintiff's attorney from making a disturbance at the store. There is no suggestion that any involvement that Mr. Wishen may have had exceeded the bounds of the qualified privilege. We infer from the failure of the plaintiff to refer to Mr. Wishen in either pleadings or argument that Mr. Wishen's incident report concerned an incident which occurred when the plaintiff's attorney came to the store after the fact seeking information related to this litigation.

B. Defendant Gary Heflin
Gary Heflin's affidavit referred to communications with Ms. Fourcade, Ms. Jimenez, Mr. Knight, Detective Tusa (the investigating law enforcement officer who was summoned to West's premises and who ultimately arrested plaintiff), and the unemployment hearing, all of which communications were subject to the qualified privilege. There is no evidence suggesting that Mr. Heflin made any communications that would not have been subject to a qualified privilege.

C. Defendant Keith Yeager
The affidavit of Keith Yeager refers to communications with Mr. Knight and Mr. *757 Heflin. Mr. Yeager's affidavit also refers to being involved in the investigation of suspicious activities reported by Ms. Jimenez and Ms. Fourcade, suggesting that he may have also had communications with them. All of these communications would be subject to a qualified privilege.

D. Defendant Marshia Jimenez
When asked in her deposition if she knew of any reason why Ms. Marshia Jimenez would have made the allegations against her, the plaintiff testified that she could have wanted her job. In the context of plaintiffs deposition testimony as a whole, plaintiff gave no reason to believe Ms. Jimenez was motivated by a desire to get the plaintiffs job. It appears in answering the question about Ms. Jimenez's motive, she was merely conjecturing in response to a question that called upon her to speculate. Plaintiff went on to testify that she had never heard Ms. Jimenez or anyone else say anything to suggest that Ms. Jimenez might have aspirations for the plaintiffs job. Plaintiff testified that she had thought of her as a friend.
Ms. Jimenez testified that she reported to Mr. Knight that she had seen someone leaving the store without going through the checkout line, but that the plaintiff had vouched for the customer. In her deposition Ms. Jimenez referred to communications with Mr. Knight, the police, and the unemployment hearing. Plaintiffs counsel did not ask her if there were any other communications. In her affidavit, Ms. Jimenez also described discussing the matter in the presence of Mr. Heflin and Ms. Fourcade. There is no evidence suggesting that she had any communications other than these, all of which would be subject to a qualified privilege.
Plaintiff's brief suggests that Marshia Jimenez may have confected her allegations against the plaintiff out of fear of losing her job because it was Jimenez and not the plaintiff who had allowed the shopper to leave the store without checking his receipt. In other words, the plaintiff suggests that there is a genuine issue that Jimenez, fearing that she failed to stop and ask for a receipt from a man she suspected might be "mystery shopper"[6], may have made up the accusations against the plaintiff in order to shift the blame and risk of a job action from herself to the plaintiff. If we assume that that is true (and there is no evidence that it is), Jimenez's actions in doing so would be in the furtherance of her own interest and not those of her employer. There is no reason to believe that West and its executives would ever authorize and ratify such allegedly deliberate misrepresentations when they could in no way advance any conceivable corporate or personal interests by doing so. Under such circumstances it cannot be said that the alleged false witness Jimenez bore against plaintiff was in the course and scope of her employment. Regardless of whether plaintiff raises a genuine issue of material fact concerning Jimenez's veracity and motive, any liability arising therefrom would be personal to Jimenez and could not be imputed to her employer or fellow workers. Accordingly, none of the allegations against Jimenez, even if shown to be true, would result in liability to the other defendants.

E. Defendant Jill Fourcade
In her affidavit, Jill Fourcade referred to communications with Mr. Heflin, Mr. Knight, Detective Tusa, and testimony she gave at the unemployment hearing. In her deposition, when asked with whom she might have discussed the incident, she recalled a discussion of the incident at which Ms. Jimenez was present in addition to Mr. Heflin and Mr. Knight. She also recalled discussing it a few days later with Samantha Boudreaux, plaintiff's immediate superior. Ms. Fourcade was then asked if *758 she had discussed the matter with anyone else in or out of the store. She responded that she might have mentioned something about the incident to her roommate and her mother. (There are no specific factual allegations in plaintiffs petition that Ms. Fourcade may have communicated with her mother or roommate, and no general allegations of publication broad enough to include Ms. Fourcade's mother and roommate. The possibility that such communications may have occurred was brought out only in discovery and argument.[7]) Beyond these communications there is no evidence suggesting that Fourcade communicated the matter to anyone else.
Defamation is an individual tort, which, as a general rule, does not give rise to solidary liability. Trentecosta v. Beck, 96-2388, p. 8 (La.10/21/97); 703 So.2d 552, 558. An exception to this rule is made when the defamatory statements are made by an employee in the course and scope of employment, at least when the defamation was authorized or ratified by the employer. Id.
An employee's actions are within the course and scope of his employment if the conduct in question is so closely connected in time, place, and causation to his employment duties as to be regarded a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by purely personal considerations entirely extraneous to the employment. Michelet v. Scheuring Sec. Services, Inc., 95-2196, p. 6 (La.App. 4 Cir. 9/4/96); 680 So.2d 140, 145; writ denied 96-2419 and 96-2429 (La.12/13/96); 692 So.2d 371 and 372. Factors to be considered are whether the tortious conduct was (1) primarily employment rooted; (2) reasonably incidental to the performance of the employee's duties; (3) occurred on the employer's premises; and (4) occurred during hours of employment. Michelet, supra, at p. 145.
Of the above described communications by Ms. Fourcade, the only ones which would not be subject to a qualified privilege would be the ones to her mother and roommate, if in fact it could be proved that she made such communications. In any event, the communications to her mother and roommate were not made in the course and scope of her employment. Therefore, regardless of the fact that they might ultimately prove to be defamatory at a trial on the merits, neither Ms. Fourcade's employer, nor her co-workers may be held liable for her individual statements outside the course and scope of her employment.

F. The "Mystery Shopper" Issue
Plaintiff suggests that a genuine issue of material fact arises from her contention in brief that Ms. Fourcade and Ms. Jimenez could have been motivated to "frame" her to divert suspicion from themselves. She contends that a "mystery shopper" employed by the store could have found evidence of complicit theft against Ms. Fourcade and Ms. Jimenez, motivating them to accuse her. Plaintiff did not make even conclusory allegations concerning the motives of Ms. Jimenez and Ms. Fourcade in her petition or elsewhere. We must judge the correctness of the summary judgment by what was presented to the trial court.
The mere fact that West Cash & Carry employed mystery shoppers is not sufficient to create a genuine issue of Ms. Jimenez's motive when any connection between a hypothetical mystery shopper and Ms. Jimenez's motive is based on mere speculation and conclusory allegations made for the first time to this court. Although summary judgment as a general *759 rule has not been regarded as the best vehicle for dealing with matters of motive and intent, there are cases in which the facts are much less persuasive than those found in the record of the instant case, where the courts have held that summary judgment is the appropriate vehicle for adjudication of a question of intent. Simoneaux v. E.I. duPont de Nemours and Co., Inc., 483 So.2d 908 (La.1986); Carter v. BRMAP, 591 So.2d 1184 (La.App. 1 Cir.1991).
Summary judgments are now favored. If a motion for summary judgment could be defeated based on such flimsy speculation, it is difficult to see how any could be granted. This is to be distinguished from the principle that this court will not consider the likelihood of success at trial of the party opposing the motion for summary judgment. Good v. Fisk, 524 So.2d 203 (La.App. 4 Cir.1988). Where a party raises a genuine issue through affidavit, deposition, or otherwise, that party is entitled to a trial on the merits regardless of the likelihood of success. But in the instant case the "mystery shopper" question is not a genuine issue or a material fact. Plaintiff raised it as a mere speculation, a possibility only in the sense that anything is possible. Plaintiff has offered nothing that, even if proven true at a trial on the merits, would support her burden of proof. Plaintiff produced testimony tending to show nothing more than the fact that West employed "mystery shoppers." Accepting this as true, or assuming that plaintiff would be able to prove this at a trial on the merits, it still would be an insufficient basis for finding that the plaintiff had succeeded in proving by a preponderance of evidence that Jimenez, whom plaintiff identified as a friend, suspected the existence of a "mystery shopper." It does not tend to show that one was involved in the incident in question, or that Jimenez or Fourcade suspected the existence of one. Even if plaintiff establishes at a trial on the merits the fact that West employed "mystery shoppers," that fact alone cannot affect the outcome of the case. A genuine issue of material fact is one that can affect the outcome of the case. Generally, material facts are those that potentially insure or preclude recovery, affect the litigant's ultimate success, or determine the outcome of a legal dispute. Prado v. Sloman Neptun Schiffahrts, A.G., 611 So.2d 691, 699 (La.App. 4 Cir.1992), writ not considered 613 So.2d 986 (La.1993).
It takes more than the existence of a mere possibility to prove a fact by the preponderance of the evidence, and plaintiff has offered no evidence that she will ever be able to prove anything more at a trial on the merits. In the absence of anything more than plaintiff's mere conjecture on this issue, we find no genuine issue of material fact concerning Jimenez's actions.
Plaintiff makes much of small discrepancies in the depositions and affidavits of Ms. Jimenez and Ms. Fourcade. It would have been more suspicious had their stories been absolutely identical in all respects and at all times and in all places as though they had rehearsed the lines of a play. The discrepancies, such as they were, were such as one would normally expect when the same event is recounted by different persons and at different times. They were not material discrepancies. See Keller v. Schwegmann Giant Supermarkets, Inc., 604 So.2d 1058, 1061 (La.App. 4 Cir.), writ denied 609 So.2d 232 (La.1992), where the court noted that:
The minor discrepancies in the testimony as to how many baskets were rung up and whether the Kellers were the very last or the next-to-last transaction before the detailed roll was pulled are irrelevant to the issue of probable cause to arrest, which clearly existed.
Plaintiff argues that neither the deposition testimony of Mr. Knight, nor the affidavits of Mr. Heflin nor Mr. Yeager are admissible because they are hearsay, based on what was told to them by Jimenez and Fourcade and consequently not *760 based on personal knowledge as required by LSA-C.C.P. art. 967. While it is true that the statements of Heflin, Knight and Yeager concerning what was related to them by Fourcade and Jimenez cannot be offered as proof that plaintiff authorized a customer to exit a store without a receipt, it is proof that management personnel had reason to suspect plaintiff and to summon the police and protest the unemployment claim, i.e., the managers may attest to what they were told in order to establish their good faith, even if not to prove that what they were told was true. Messrs. Knight, Yeager, and Heflin can attest, based on their own personal knowledge, as to what was told to them by Ms. Jimenez and Ms. Fourcade, even though they cannot attest, based on their own personal knowledge, that what was told to them was true.
The defendants have made a prima facie showing of good faith. Therefore, the burden shifts to the plaintiff to show bad faith. The plaintiff has failed to make such a showing. Plaintiff did not testify by deposition or attest by affidavit to any knowledge of publication beyond Knight, Heflin, Yeager, Fourcade and Jimenez, all of whom had a qualified privilege to discuss the affair in an employment context. There is a genuine issue of material fact only as to non-employment related communications made by Ms. Fourcade which may not be protected by the qualified privilege.

III. INTENTIONAL AND/OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
Any emotional distress plaintiff experienced would have been as an element of damage arising out of her claims for false imprisonment and arrest, defamation and malicious prosecution. Her emotional distress under the facts alleged in this case do not give rise to a cause of action separate and apart from her claims for false imprisonment/arrest, defamation and, malicious prosecution. Therefore, there is no need to consider plaintiff's claim for intentional and/or negligent infliction of emotional distress separately.

IV. MALICIOUS PROSECUTION
The plaintiff did not specifically refer to "malicious prosecution" by name in her petition, but her allegations of fact concerning plaintiffs arrest by law enforcement officers were sufficient to raise the issue. On appeal, plaintiff did not specifically refer to malicious prosecution among her specifications of error, but in her brief she described facts and cited cases sufficient to raise the issue. It appears that the plaintiff has, in effect, combined her claim for malicious prosecution with that of defamation and/or false imprisonment. Therefore, we shall consider the issue of malicious prosecution in connection with this appeal.
The distinction between actions for false imprisonment and those for a malicious prosecution are far apart. In a false imprisonment, the arrest is made either without any legal process or warrant, or under a warrant null upon its face. In a malicious prosecution, the proceedings are had in pursuance of legal process, maliciously and wrongfully obtained. DeBouchel v. Koss Const. Co., Inc., 177 La. 841, 149 So. 496. Lord Mansfield says, in noting the difference between false imprisonment and malicious prosecution, that: "* * * The wrongdoer in making the unlawful arrest or causing it to be made, takes the law in his own hands and acts without a warrant from a court or magistrate while the man who instigates a malicious prosecution puts the machinery of criminal law into operation, causing a warrant to issue and the arrest under the warrant."
Barfield v. Marron, 222 La. 210, 220, 62 So.2d 276, 280 (1952). See also Winn v. City of Alexandria, 96-492, p.4 (La.App. 3 Cir. 11/20/96); 685 So.2d 281, 283; Tillman v. Holsum Bakeries, Inc., 244 So.2d 681, 682 (La.App. 4 Cir.), writ denied 258 *761 La. 352, 246 So.2d 199 (1971); Reese v. City of Baton Rouge, 93 1957 (La.App. 1 Cir. 10/7/94); 644 So.2d 674, 676.
False arrest and imprisonment occur when one arrests and restrains another against his will without a warrant or other statutory authority. Kyle v. City of New Orleans, 353 So.2d 969, 971 (La.1977); Barry v. Dennis, 93-1301 (La.App. 4 Cir. 2/25/94); 633 So.2d 806, writ denied 94-0708 (La.4/29/94); 637 So.2d 468; Hughes v. Gulf Intern., 593 So.2d 776 (La.App. 4 Cir.), writ denied 595 So.2d 658 (La.1992). As may be seen by reference to these cases, false arrest is not distinguished as a separate tort from false imprisonment. See also Restrepo v. Fortunato, 556 So.2d 1362 (La.App. 5 Cir.), writ denied 560 So.2d 11 (La.1990).
Actions for malicious prosecution have never been favored, and hence, in order to sustain them, a clear case must be established. Eusant v. Unity Industrial Life Ins. and Sick Ben. Ass'n of New Orleans, 195 La. 347, 196 So. 554 (1940); Coleman v. Kroger Co., 371 So.2d 1186 (La.App. 1 Cir.), writ denied 372 So.2d 1041 (La.1979).
The law protects persons who resort to the courts to redress wrongs when they act in good faith upon reasonable grounds in commencing such a proceeding.
Aucoin v. Aetna Cas. & Sur. Co., 520 So.2d 795, 798 (La.App. 3 Cir.1987); see also Craig v. Carter, 30,625 (La.App. 2 Cir. 9/23/98); 718 So.2d 1068, writ denied 98-2698 (La.12/18/98), 734 So.2d 636;.
To prevail in a malicious prosecution claim the plaintiff must prove six elements: (1) the commencement or continuance of an original criminal or civil judicial proceeding, (2) its legal causation by the present defendant against the plaintiff who was defendant in the original proceeding, (3) a bona fide termination in favor of the present plaintiff, (4) the absence of probable cause for such proceeding, (5) the presence of malice therein, and (6) damage. Sam Z. Scandaliato & Assoc., Inc. v. First Eastern Bank, 629 So.2d 1347 (La.App. 4 Cir.1993), writ denied 94-0142 (La.3/11/94); 634 So.2d 391; Keller v. Schwegmann Giant Supermarkets, Inc., supra; Craig v. Carter, 30,625 (La.App. 2 Cir. 9/23/98); 718 So.2d 1068, writ denied (La.12/18/98); 734 So.2d 636.
The Supreme Court has defined "malice" as follows:
Malice is found when the defendant uses the prosecution for the purpose of obtaining any private advantage, for instance, as a means to extort money, to collect a debt, to recover property, to compel performance of a contract, to "tie up the mouths" of witnesses in another action, or as an experiment to discover who might have committed the crime. Malice may be inferred from the lack of probable cause or inferred from a finding that the defendant acted in reckless disregard of the other person's rights. [Citations omitted.]
Miller v. East Baton Rouge Parish Sheriff's Dept., 511 So.2d 446, 453 (La.1987); Keller, supra, at p. 1061.
Malice exists when a charge is made with knowledge that it is false or with reckless disregard for the truth. Aucoin, supra, 520 So.2d at 798 (La.App. 3 Cir.1987).
The crucial determination in regard to the absence of probable cause is whether the defendants had an honest and reasonable belief in the allegations they made. Reese v. City of Baton Rouge, 93 1957 (La.App. 1 Cir. 10/7/94); 644 So.2d 674, 676-77; Brimmer v. A. Copeland Enterprises, Inc., 609 So.2d 847, 848 (La.App. 5 Cir.1992), writ denied, 616 So.2d 682 (La.1993). West and its executives have presented evidence that they had an honest and reasonable belief in the allegations they made to the arresting officer and to the state unemployment agency.
Although plaintiff speculates that Ms. Fourcade and Ms. Jimenez may have had motives of private advantage, there is not *762 sufficient support in the record to elevate this speculation to the level of a genuine issue of material fact. As to the other defendants, there is not even a speculative suggestion of personal motive. To the contrary, as noted near the beginning of this opinion, for example, it was Samantha Boudreaux who told the plaintiff about the availability of employment with West, and Mr. Knight, the principal moving force in this whole sequence of events, had only recently given the plaintiff a raise and a promotion.
West and its executives have shown that they had probable cause to summon the police and make allegations leading to the plaintiffs arrest:
Probable cause is not synonymous with "preponderance" [of the evidence], being somewhere between "preponderance" and "suspicion." [Footnote omitted] ...
In addition, there is no conflict with finding that Young Oil Company had probable cause to prosecute, and at the same time finding that Young Oil Company had not proven its claim by a "preponderance of the evidence." Probable cause focuses as much on the "reasonable state of mind of Young in bringing the charge as the actual fact." [Emphasis added; citation omitted.]
Young Oil Co. of La., Inc. v. Durbin, 412 So.2d 620, 626-627 (La.App. 2 Cir.1982); see also State v. One (1) 1991 Pontiac Trans Sport Van, 98-64, p. 4 (La.App. 5 Cir. 7/9/98); 716 So.2d 446, 449.
Therefore, the fact that the unemployment hearing officer found that the defendants failed to prove their allegations against the defendant by a preponderance of the evidence does not establish a lack of probable cause. Just as in Young, where the "reasonable state of mind" of the plaintiffs accuser was a major factor in determining probable cause, we find that the defendants have established their reasonable state of mind and the defendants have failed to offer any rebuttal evidence.
Plaintiff failed to produce evidence to rebut defendants' showing that the decision of West and its executives to summon law enforcement authorities and report allegations, in which they had an honest and reasonable belief, resulting in the defendant's arrest, was made in good faith and without malice. There was no error in the trial court's failure to find any genuine issue of material fact in connection with plaintiffs claim for malicious prosecution.

DECREE
For the foregoing reasons, the judgment of the trial court is reversed and remanded as to plaintiffs claim against Jill Fourcade and the XYZ Insurance[8] Company for defamation. The judgment of the trial court is affirmed as to all other defendants.
AFFIRMED IN PART AND REVERSED IN PART AND REMANDED.
MURRAY, J., dissents with reasons in part.
MURRAY, J., dissents in part with reasons:
Because I find that the defendants have not established that they are entitled to judgment as a matter of law on Ms. Kelly's claim for false imprisonment, I must respectfully dissent from the majority's disposition on this issue.
Under Article 2315 of the Louisiana Civil Code, damages for the tort of false imprisonment may be recovered if it is proven (1) that plaintiff was detained and (2) that the detention was unlawful. Hughes v. Gulf International, 593 So.2d 776, 780 (La.App. 4th Cir.), writ denied, 595 So.2d 658 (La.1992); Harrison v. Phillips, 539 So.2d 911, 913 (La.App. 4th Cir.), writ denied, 541 So.2d 894 (La.1989), and cases cited therein.
*763 I do not agree with the majority's statements that the law requires "proof of total restraint" in order to establish that a detention occurred.[9] Instead, the plaintiff's burden under Louisiana law is to show that "her freedom of choice and action were ... restricted and a restraint was effectively placed upon her liberty." Clark v. I.H. Rubenstein, Inc., 326 So.2d 497, 499 (La.1976) (holding that a shopper who complied with a merchant's request to return to the store and who voluntarily submitted to a public inspection of her packages "was certainly subjected to a detention."). As this court stated the test in Harrison, supra, 539 So.2d at 913, "plaintiff must prove by a preponderance of the evidence that [s]he was actually detained, or such circumstances as would lead a reasonable person to believe [s]he was not free to leave...." In Harrison, as here, an employer questioned an employee about recent thefts, then left the employee in an office until the police arrived and conducted a brief investigation. Although this court affirmed the trial court's rejection of the claim for false imprisonment, this was based upon the fact that the evidence concerning the extent of restraint was contradictory: "Clearly, this issue was a credibility call by the trial judge and we do not find manifest error." Id. at 914.
In my view, the contradictory testimony presented hereplaintiff's evidence that she was ordered to remain in the office for an indeterminate period of time and defendants' evidence that she "was always free to leave" despite the summoning and arrival of the policepresents a genuine and material factual dispute as to whether Ms. Kelly was detained, as required for recovery under this state's laws and jurisprudence. Of course, the factfinder may consider all the circumstances, including the employer-employee relationship, in order to answer this question. Nevertheless, I find that, like the plaintiff in Harrison, Ms. Kelly has submitted sufficient evidence to go to trial on her claim for false imprisonment, thus defeating the defendants' motion for summary judgment.
I concur in the majority's results as to the remainder of Ms. Kelly's claims, particularly in light of the fact that the roommate with whom Ms. Fourcade admitted discussing these events was also employed at the West store in question.
NOTES
[1] Jimenez's name was spelled "Gimenez" in the original petition and elsewhere. It is impossible to be certain which spelling is correct.
[2] LaBauve's name was spelled "LaBorde" in the original petition. Moreover, we note that there are no factual allegations against La-Bauve in the petition. Plaintiff's petition does not allege that he was present or even knew of any of the events that are the subject of this litigation. Thus, plaintiff's petition fails to state a cause of action against Michael La-Bauve, a defect which this court may notice on its own motion
[3] Heflin's name was spelled variously "Huffuman" and "Hauffman" in the original petition.
[4] Referred to as "the leading case" by Stone  Louisiana Civil Law Treatise, Vol. 12, La. Tort Doctrine, Sec. 203, at p. 267 (1977).
[5] The defendants contend that the partial copy of the decision of the Administrative Law Judge for the Office of Employment Security annexed to plaintiff's appellate brief is not properly part of the record. However, a complete copy was furnished to this Court in the same exhibit envelope that contained the defendants' exhibits. Among those other exhibits were the depositions of Burnetta Kelly which the defendants claim as one of their own exhibits along with the depositions of Mr. Knight, Ms. Jimenez, and Ms. Fourcade, all of which are pierced by the same identical double hole punches at the top of each page. The defendants have made no objection to any of these other exhibits, and as already noted even claim the deposition of Burnetta Kelly as one of their own. It, therefore, appears to this Court that the trial judge had all of these exhibits before him in making his decision. We feel that the defendants are not prejudiced by our consideration of these exhibits as nothing contained in them leads us to find in favor of the plaintiff.

The findings of the Administrative Law Judge did not conclude that the allegations against the plaintiff were baseless, irresponsible or malicious. Instead he found only that:
In this case, the preponderance of the evidence fails to support legal misconduct. Put another way, there is doubt concerning an incident that eventually led to the claimant's discharge. In the case of Sewell v. Sharp, 102 So.2d 259 (La.App. 2d Cir. 1958), the court held that the term "misconduct" should be construed in such a manner as to give the benefit of the doubt to the claimant.
Giving the plaintiff the "benefit of the doubt" is a far cry from implying that the defendants lacked good faith or were malicious.
[6] The store was said to have in its employ certain anonymous "mystery shoppers" whose job it was to test employees.
[7] The only factual allegations concerning Ms. Fourcade and Ms. Jimenez are to be found in paragraph "XVI" of plaintiff's petition:

The Plaintiff was arrested based upon false statements by Jill Fourcade and Marshia Gimenez. Jill Fourcade and Marshia Gimenez falsely accused the Plaintiff of allowing a phantom shoplifter to leave the store with unknown merchandise.
[8] There is no evidence in the record that the XYZ Insurance Company was ever identified. It was not a named party to the defendants' motion for summary judgment.
[9] Although the Louisiana Supreme Court quoted another authority to state that "False imprisonment is the unlawful and total restraint of the liberty of the person" in Crossett v. Campbell, 122 La. 659, 664, 48 So. 141, 143 (1908), the statement was dicta, as it was found that the defendant sought to remove the plaintiff from the premises, "not to imprison him."