964 So.2d 385 (2007)
John C. WINGRAVE, II
v.
Kevin M. HEBERT, Donna Boehmer and Duane Abadie.
No. 2006-CA-1240.
Court of Appeal of Louisiana, Fourth Circuit.
May 9, 2007.
Opinion Granting Rehearing July 25, 2007.
*386 Robert G. Harvey, Sr., Robert G. Harvey, Sr., APLC, New Orleans, LA, for John C. Wingrave, II.
Gregory C. Weiss, Weiss & Eason, L.L.P., Mandeville, LA, William T. Finn, John Anthony Dunlap, Carver, Darden, Koretzky, Tessier, Finn, Blossman & Areaux, L.L.C., New Orleans, LA, for Whitney National Bank and Paul Bergeron.
(Court composed of Judge CHARLES R. JONES, Judge PATRICIA RIVET MURRAY, Judge TERRI F. LOVE).
TERRI F. LOVE, Judge.
This appeal arises from the use of a telephone conversation obtained with a wiretap in violation of the Louisiana Electronic Surveillance Act. Whitney National Bank fired John Wingrave after learning that he allegedly threatened a supervisor during the course of the audiotaped conversation. John Wingrave filed suit for damages against Whitney National Bank, three fellow employees, and the party who illegally tapped the phone. Whitney National Bank and its employees filed a motion for summary judgment, which the trial court granted. The trial court denied a motion for a new trial and John Wingrave appeals asserting the trial court erred in granting the motion for summary judgment. We find genuine issues of material fact exist as to whether the matters discussed *387 during the illegally obtained telephone conversation constitute a matter of public concern, are covered by a privilege, or if all of the claimed damages are preempted by the National Bank Act. We reverse and remand.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY
John Wingrave ("Mr.Wingrave") worked as an employee of Whitney National Bank ("WNB") for almost twenty-five years. On Thursday, September 23, 1999, Mr. Wingrave received a telephone call from a fellow employee, Holley Haag ("Ms.Haag") at his home after a WNB function and a night of drinking. Mr. Wingrave was romantically involved with Ms. Haag at the time. Unbeknownst to either Mr. Wingrave or Ms. Haag, Kevin Hebert ("Mr.Hebert"), Ms. Haag's fiancé,[1] had illegally tapped Ms. Haag's telephone and recorded the conversation. During the course of their conversation, Mr. Wingrave allegedly threatened his supervisor, Donna Boehmer ("Ms.Boehmer") because of a negative employee evaluation.
Mr. Hebert was out of town when the conversation occurred, but upon his return on September 26, 1999, he contacted Mr. Wingrave and his wife regarding the tapped and audiotaped telephone conversation. He told Mrs. Wingrave that Mr. Wingrave was having an affair with Ms. Haag and that he had recorded telephone conversations and photographs as proof.
Mr. Hebert also contacted Ms. Boehmer and informed her that he allegedly heard one of her employees threaten her during a telephone conversation that he recorded. However, at first, he did not explicitly reveal the name of the employee. Ms. Boehmer then contacted Duane Abadie ("Mr.Abadie"), the senior vice president, about how she should proceed with the information after surmising that Mr. Hebert was referring to Mr. Wingrave. Mr. Abadie decided that Ms. Boehmer should work from home until she received further information.
Mr. Wingrave felt that he should consult with an attorney about the allegedly recorded telephone conversation. He attempted to drive to Gerard Archer's ("Attorney Archer") home to discuss the matter. However, he could not remember the exact numerical address and rang the doorbell of Mr. Abadie. Mr. Wingrave then decided to discuss the situation with Mr. Abadie and admitted that he was drunk during the conversation and had said "bad things" in reference to Ms. Boehmer. However, Mr. Wingrave stated that he could not remember exactly what he said during his conversation with Ms. Haag. Mr. Abadie informed Mr. Wingrave that he had spoken with Ms. Boehmer, who already knew about the alleged threats, and that the issue would be discussed with WNB's Human Resources Department (Human Resources) the next day.
On Monday, September 27, 1999, Attorney Archer sent a letter, which WNB received the same day, stating that the telephone conversation in question was obtained in violation of the Louisiana Electronic Surveillance Act ("LESA") and that the contents could not be used against Mr. Wingrave. Also, Mr. Abadie met with Paul Bergeron ("Mr.Bergeron"), the head of Human Resources. As a result, Mr. Wingrave was suspended "pending further investigation." Mr. Bergeron had Anne Leach ("Ms.Leach"), his assistant, *388 talk to Mr. Hebert to get more information about Mr. Wingrave's telephone conversation. Human Resources told Mr. Wingrave to come to WNB's main branch on Wednesday, September 29, 1999. At that meeting, Mr. Bergeron terminated Mr. Wingrave's employment.
Mr. Wingrave filed a petition for damages against Mr. Hebert, Ms. Boehmer, and Mr. Abadie. Ms. Boehmer and Mr. Abadie sought to remove the case to the United States District Court for the Eastern District Court of Louisiana ("Eastern District") based on preemption grounds due to the National Bank Act ("NBA"). However, the Eastern District remanded the case back to the trial court because it stated that it lacked subject matter jurisdiction and the NBA did not provide for complete preemption.
Ms. Boehmer and Mr. Abadie then filed a reconventional demand seeking damages for emotional distress and seeking compensatory and punitive damages for Ms. Boehmer alleging that Mr. Wingrave's behavior constituted a hate crime. Mr. Wingrave then filed his first supplemental and amended petition adding Mr. Bergeron and WNB as defendants (all collectively referred to as the "Defendants").
After lengthy discovery and several trial court judgments stemming from motions to compel and motions for sanctions, the Defendants filed a joint motion for summary judgment based upon NBA preemption. Mr. Wingrave then filed a motion for partial summary judgment seeking the determination of the illegality of the audiotape. The trial court denied the Defendants' summary judgment and granted Mr. Wingrave's partial motion for summary judgment finding that the tape was illegal. Both parties sought supervisory review from this Court. This Court ruled that the trial court erred in granting Mr. Wingrave's partial summary judgment as to the legality of the tape; the trial court correctly denied WNB's summary judgment based on the NBA; and the trial court correctly denied Mr. Wingrave's motion to reconsider as to producing the audiotape.[2] This Court later clarified the writ by stating that the Eastern District's decision was not res judicata as to the NBA.[3]
WNB filed a third party demand against Mr. Hebert. Ms. Boehmer and Mr. Abadie filed a supplemental answer and reconventional demand asserting that the application of LESA to them was unconstitutional and that they were entitled to a declaratory judgment based on that premise. The trial court granted WNB and Mr. Bergeron's request to dismiss Mr. Hebert from claims in the Defendants' third party demand without prejudice.
The Defendants filed another motion for summary judgment.[4] The trial court then ordered that a transcript of one portion of the audiotape be admitted into evidence under seal and reserved a ruling on the issue of the admissibility of the remainder of the audiotape. The trial court granted the motion for summary judgment, finding that the conversation constituted a matter of public concern, and dismissed Ms. Boehmer, Mr. Abadie, Mr. Bergeron, and WNB with prejudice. Mr. Wingrave filed a motion for a new trial, *389 which the trial court denied for the reasons set forth in the judgment on the motion for summary judgment. Mr. Wingrave then filed this devolutive appeal asserting that the trial court erred in granting the summary judgment and dismissing WNB, Ms. Boehmer, Mr. Abadie, and Mr. Bergeron.

OUTSTANDING MOTIONS ON APPEAL
Ms. Boehmer and Mr. Abadie filed a motion to supplement the record with the sealed transcript of one threat from the recorded telephone conversation. As the trial court already admitted the transcript into evidence under seal and the record already contains the transcript, we find discussion of this motion moot.
Mr. Wingrave filed an incorporated motion and memorandum with his appellate brief to correct the appellate record by the supplementation of eight exhibits attached to the motion for reconsideration from April 19, 2006. Mr. Wingrave alleges that the trial court record submitted to this Court was incomplete. To preserve the record for review, Mr. Wingrave's incorporated motion to supplement the record is granted.

STANDARD OF REVIEW
Appellate courts review summary judgments using the de novo standard. Reynolds v. Select Props., Ltd., 93-1480 (La.4/11/94), 634 So.2d 1180, 1183. The court must examine the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" to find genuine issues of material fact. La. C.C.P. art. 966(B). If no genuine issues of material fact are found, the "mover is entitled to judgment as a matter of law." La. C.C.P. art. 966(B). The mover bears the burden of proof. La. C.C.P. art. 966(C)(2).

NATIONAL BANK ACT
The Defendants aver that the NBA preempts Mr. Wingrave's claims because it preempts a state law that limits the freedom of a national bank to dismiss officers at will. See 12 U.S.C. § 24 (Fifth) (2006). They contend that all of Mr. Wingrave's claimed damages resulted from his termination. Ms. Boehmer and Mr. Abadie sought removal to the Eastern District based on NBA preemption.[5] However, Mr. Wingrave's alleged damages of "embarrassment, emotional distress, marital problems, embarrassment in the community," "loss of reputation," and defamation are damages which could have stemmed from the release of his telephone conversation and affair with Ms. Haag, irrespective of WNB terminating his employment. We find that it is for the trier of fact to determine whether the alleged damages resulted from Mr. Wingrave's termination.

LOUISIANA ELECTRONIC SURVEILLANCE ACT
Mr. Wingrave asserts that the trial court erred in dismissing his claims because they arise under LESA. The Defendants contend that they did not act willfully, which alleviates recovery under LESA. LESA, as contained in La. R.S. 15:1301, et seq., prohibits the interception, disclosure, and/or use of "wire, electronic, or oral communication." La. R.S. 15:1303. LESA reads, in pertinent part:
A. [I]t shall be unlawful for any person to:

*390 (1) Willfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire or oral communication;
. . . .
(4) Willfully use, or endeavor to use, the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this Subsection.
La. R.S. 15:1303. (Emphasis added). It provides for monetary penalties and imprisonment for people who violate the above provision. La. R.S. 15:1303. LESA also provides that:
No person may broadcast, publish, disseminate, or otherwise distribute any part of the content of an electronic communication intercepted in violation of the provisions of this Chapter unless such dissemination or distribution is made to an investigator or law enforcement officer conducting an investigation into a violation of the provisions of this Section.
La. R.S. 15:1307(B). "Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this Chapter shall have a civil cause of action. . . ." La. R.S. 15:1312(A).
The substance of LESA was first interpreted in Keller v. Aymond, 98-844, 98-843 (La.App. 3 Cir. 12/23/98), 722 So.2d 1224, in which case private individuals sued a newspaper for publishing portions of their private conversations. Noting that LESA was modeled after its federal counterpart, 18 U.S.C. § 2510, et seq., the court found federal jurisprudence to be "instructive in the areas where the provisional language coincides." Id., 98-844, 98-843, p. 6, 722 So.2d at 1227. The court also stated that it must carefully balance the "public's interest in access" and "freedom of the press against the individual's privacy interests." Id., 98-844, 98-843, p. 6, 722 So.2d at 1228. Following the initial disclosure by the defendant, the content of the conversations remained protected by LESA. Keller, 98-844, 98-843, p. 8, 722 So.2d at 1228. Additionally, the "allegedly illegal nature of the interceptions" entitled "the plaintiffs to even greater protection. . . ." Id. After comparing LESA to its federal counterpart, the court opined that LESA "should be stringently enforced and construed against the violator of any of its sections pursuant to a literal interpretation of the statute." Id., 98-844, 98-843, p. 11, 722 So.2d at 1230.
Keller further examined the interpretation of La. R.S. 15:1303 and found that criminal willfulness was not required. 98-844, 98-843, p. 12, 722 So.2d at 1230. The court concluded that a violation of LESA occurs if the person who disclosed or used the intercepted communications had "reason to know that it was illegally obtained." Id. Moreover, the court found that people who use intercepted information that are not the first users are "liable for civil penalties pursuant" to La. R.S. 15:1312. Id., 98-844, 98-843, p. 17, 722 So.2d at 1233. The court held that LESA, pursuant to La. R.S. 15:1312 in regard to civil remedies, with a literal interpretation, does not require an intentional or willful usage. Keller, 98-844, 98-843, p. 20, 722 So.2d at 1234. Finally, the court stated:
[e]ven without evidence of certain knowledge, the circumstances themselves create issues of fact wherein it seems that any reporter handed an audiotape and transcript of a private conversation between parties not in attendance would have `reason to know' that the communications were obtained without consent.
Id., 98-844, 98-843, p. 23, 722 So.2d at 1235.
*391 Ms. Boehmer received a telephone call from Mr. Hebert, who informed her that he had an audiotaped conversation between two employees and that one employee made threatening remarks about her. First, Mr. Hebert was not an employee of Ms. Boehmer's. Thus, she was aware that he was not a party to the audiotaped conversation. Second, Ms. Boehmer knew that Mr. Hebert was not a law enforcement official; therefore, he could not have taped the conversation pursuant to an authorized wiretap. Third, Ms. Boehmer allegedly told Mr. Hebert that she did not want to hear the conversation or anything further about it. Fourth, Ms. Boehmer did not know Mr. Hebert personally and had never spoken with him. Accordingly, we find that genuine issues of material fact exist as to whether the Defendants knew or had reason to know that the information was illegally obtained.

Matter of Public Concern
The trial court considered whether the telephone conversation involved a matter of "such public concern" and concluded that the content "would be considered threatening to any reasonable person." Thus, the trial court found that the Defendants "had a right to act on this information" and granted the summary judgment.
Mr. Wingrave asserts that the trial court erred in holding that the contents of the telephone conversation constituted a matter of public concern in that the trial court misapplied Bartnicki v. Vopper, 532 U.S. 514, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001). The Defendants contend that the trial court's interpretation and usage of Bartnicki mandates the affirmation of the granting of summary judgment. The Defendants also aver that punishing them pursuant to LESA would be unconstitutional based upon Bartnicki.
The United States Supreme Court examined what level of First Amendment protection was provided to "speech that discloses the contents of an illegally intercepted communication." Bartnicki, 532 U.S. at 517, 121 S.Ct. 1753. One of the plaintiffs in Bartnicki was a president of the local teachers union involved in contentious negotiations, between the school board and teachers, and the other was a chief negotiator. Id. at 518, 121 S.Ct. 1753. The news media covered the negotiations extensively. Id. Both plaintiffs were involved in a cellular telephone conversation wherein they discussed the difficulties of the negotiations and one of them suggested a "dramatic response" like blowing off the front porches of the opposition. Bartnicki, 532 U.S. at 518-19, 121 S.Ct. 1753. An unknown party illegally intercepted this conversation. Id. at 518, 121 S.Ct. 1753.
Afterward, the union and the school board accepted a nonbinding arbitration proposal. Id. at 519, 121 S.Ct. 1753. However, one defendant, a radio commentator, did not like the union and played the audiotaped conversation, another station broadcast it, and some newspapers published the contents. Id. One defendant received the audiotape from the head of a local taxpayer's organization, which had opposed the union. Id. He stated that the audiotape was left in his mailbox and that he played the audiotape for some school board members. Id. The Supreme Court determined that, "at a minimum," the defendants had a reason to know that the conversation was intercepted illegally. Bartnicki, 532 U.S. at 525, 121 S.Ct. 1753. In holding that the content of the conversation was a matter of public concern, the Supreme Court stated:
[i]f the statements about the labor negotiations had been made in a public arena-during a bargaining session, for example-they would have been newsworthy. This would also be true if a *392 third party had inadvertently overheard Bartnicki making the same statements to Kane when the two thought they were alone.
Id. Accordingly, the Supreme Court held that a "stranger's illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern." Id. at 535, 121 S.Ct. 1753.
However, we find Bartnicki distinguishable and not automatically controlling to the case sub judice. The Louisiana Supreme Court held that "[s]peech on matters of public concern enjoys enhanced constitutional protection." Romero v. Thomson Newspapers (Wisconsin), Inc., 94-1105 (La.1/17/95), 648 So.2d 866, 869. The record reflects that Mr. Wingrave and Ms. Haag's audiotaped telephone conversation was not regarding information reported in the media. Whether Mr. Wingrave and Ms. Haag were involved in or discussing an event that was of current public concern, as were the union negotiators in Bartnicki, is a factual determination. It is undisputed that Mr. Wingrave and Ms. Haag's telephone conversation occurred after work hours in the comfort of their own homes, while Mr. Wingrave was allegedly extremely intoxicated. Neither Ms. Hebert nor any member of HNB's security team ever informed law enforcement officials of Mr. Wingrave's statements. We find that these facts create genuine issues of material fact as to whether Mr. Wingrave's statements constituted a matter of public concern under the holding of Bartnicki. Whether "any reasonable person" would consider the statements threatening is also a factual determination to be determined by the trier of fact.

Qualified Privilege
The Defendants assert that the disclosures and communications among them regarding Mr. Wingrave's telephone conversation were protected by a privilege.
The cases imposing a qualified privilege apply to defamation and libel cases following a disclosure of a communication. Mr. Wingrave includes a claim for defamation in his first supplemental and amended petition. However, the cases require good faith. See Kelly v. West Cash & Carry Bldg. Materials Store, 99-0102 (La.App. 4 Cir. 10/20/99), 745 So.2d 743; Clements v. Ryan, 382 So.2d 279 (La.App. 4th Cir.1980); Toomer v. Breaux, 146 So.2d 723 (La.App. 3rd Cir.1962). "[A] publication enjoys a qualified or conditional privilege if made (a) in good faith; (b) on any subject matter in which the person communicating has an interest or in reference to which he has a duty; and, (c) to a person having a corresponding interest or duty." Clements, 382 So.2d at 282, quoting Ward v. Sears, Roebuck & Co., 339 So.2d 1255, 1261 (La.App. 1st Cir.1976). "A statement is made in good faith when it is made with reasonable grounds for believing it to be true." Kelly, 99-0102, p. 11, 745 So.2d at 752. This privilege can include communication regarding an employee's conduct if it "bears on the employer's interest." Id.
Ms. Boehmer was confronted with a telephone call from Mr. Hebert, whom she had never met and did not personally know, who told her that he heard an employee make threats against her in an audiotaped telephone conversation. Mr. Hebert did not initially disclose to Ms. Boehmer which employee he allegedly heard threatening her. Ms. Boehmer surmised that he was talking about Mr. Wingrave. She also indicated to Mr. Hebert that she did not want to hear anything further regarding the alleged threats. Ms. Boehmer then contacted Mr. Abadie that Sunday about Mr. Hebert's comments. At that point in time, the alleged threats had *393 not been heard via an audiotape recording, admitted to, or confirmed by a well-known or reliable source. Therefore, we find that genuine issues of material fact exist as to whether there existed reasonable grounds for belief that Mr. Hebert's statements were true, as required for good faith, prior to Mr. Wingrave admitting that he made some disparaging remarks, which he could not remember due to his intoxication.

DECREE
For the above-mentioned reasons, we find that genuine issues of material fact exist as to whether the telephone conversation contained matters of public concern, whether a qualified privilege applies, and if all claimed damages are preempted by the NBA. We reverse and remand for proceedings consistent with this opinion.
REVERSED AND REMANDED.

ON APPLICATION FOR REHEARING
PER CURIAM.
Considering the foregoing rehearing application filed by appellees, Donna Boehmer, Duane Abadie, Paul Bergeron, and Whitney National Bank, the application is granted for clarification. However, this per curiam is issued for the sole purpose of clarification of factual statements contained in the original opinion.
First, this Court stated that Mr. Wingrave "attempted to drive to Gerard Archer's ("Attorney Archer") home," but that he was unable to remember Attorney Archer's exact address. Mr. Wingrave alleges that this is why he arrived at Mr. Abadie's house instead of Attorney Archer's. However, Mr. Wingrave's motive and allegation about his arrival at Mr. Abadie's house are factual determinations to be made by the fact finder and are not specifically revealed in the record.
Second, this Court referenced the letter sent by Attorney Archer to Whitney National Bank. The Court's opinion stated that the letter warned that the telephone conversation was obtained in violation of the Louisiana Electronic Surveillance Act. However, the letter stated that the allegedly recorded telephone conversation, if taped without the consent of Ms. Haag or Mr. Wingrave, was in violation of federal and state law.
Third, the opinion stated that Ms. Boehmer received a telephone call from Mr. Hebert regarding an audiotaped conversation between two Whitney National Bank employees in which she was allegedly threatened. Pursuant to this, the opinion stated that Ms. Boehmer knew that Mr. Hebert was not a party to the conversation because he was not a Whitney employee. Out of an abundance of caution, this Court now states that this is a factual determination for the fact finder. Further, in the same paragraph, we concluded that Ms. Boehmer was aware that Mr. Hebert was not a law enforcement official and could not have authorized a wiretap for the allegedly recorded conversation. Whether Ms. Boehmer knew or thought that Mr. Hebert was not a law enforcement officer is a factual determination for the fact finder as the record reveals that Mr. Hebert may not have explicitly mentioned his profession. Ms. Boehmer's knowledge regarding whether Mr. Hebert recorded the telephone conversation himself or possessed a tape is also a question for the fact finder.
In all other respects, this Court's previous opinion remains unchanged.
REHEARING GRANTED.
NOTES
[1] The record refers to Mr. Hebert as Ms. Haag's fiance, boyfriend, ex-boyfriend, and ex-fiancé.
[2] Wingrave v. Hebert, 03-C-0335 c/w 03-C-0336 c/w 03-C-0372 (La.App. 4 Cir. 7/16/03), 852 So.2d 3.
[3] Wingrave v. Hebert, 03-C-0335 c/w 03-C-0336 c/w 03-C-0372 (La.App. 4 Cir. 9/10/03), 855 So.2d 442.
[4] The case was realloted and a new trial court judge assigned.
[5] The Eastern District granted Mr. Wingrave's motion to remand, stated that the NBA has never provided for complete preemption, and found that the Eastern District lacked subject matter jurisdiction because the NBA did not preempt Mr. Wingrave's claims.